UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| KWAMI WILLIAMS,<br><br>                                 **Plaintiff,**<br><br>       v.<br><br>INTERNATIONAL PAPER COMPANY, et al.,<br><br>                                 **Defendants.** | Civil No. 21-19765 (MJS) |

**O P I N I O N   &   O R D E R**

This matter comes before the Court on defendant International Paper Company's ("IPC") motion to dismiss [ECF No. 64] plaintiff Kwami Williams's Third Amended Complaint ("TAC") [ECF No. 55] pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court hears this matter with the written consent of the parties to conduct all proceedings in this matter in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. ECF Nos. 13, 27. Having considered the parties' submissions,[1] the Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, IPC's motion to dismiss is **GRANTED**.

**I.      Background[2]**

---

[1] Defendant Air Conveying Corporation filed its answer to the TAC on December 8, 2023, and has not taken a position as to IPC's motion to dismiss. ECF No. 63.

[2] For the purposes of this Motion, the Court accepts as true all the factual allegations in the TAC, as well as all reasonable inferences that could be drawn from them, and construes them in a light most favorable to Plaintiff. See Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010).

Plaintiff was hired by IPC as a machine operator in its Bellmawr, New Jersey, location in April 2015. ECF No. 55 ¶ 8. IPC is a pulp and paper company that operates its Bellmawr location as a corrugated box manufacturing facility. Id. ¶ 2. As part of the box-making process, "materials are fed through the trench conveyor trim removal system." Id. ¶ 10. The trench conveyor trim removal system is a piece of machinery comprised of a system of conveyor belts and pulleys which deliver waste materials to a collection chute. Id. ¶ 40. In general, "most of the waste material" is collected by the system, but not all of it, and some "falls off the conveyor belt and lands in the pit/trench area." Id. ¶ 11. This area "is about five feet deep" and must be accessed by ladder. Id. ¶ 15. An overaccumulation of waste in the pit area can create a fire hazard and pose a risk of jamming the system's conveyor belt. Id. ¶ 11. As a result, beginning in 2019, IPC employees cleaned the pit area "manually" approximately once per week. Id. ¶¶ 11, 14. However, IPC did not specially train employees in cleaning the pit area, and there was "no one employee or group of employees at the Bellmawr facility . . . whose job duty . . . was to remove the waste from the trench conveyor trim removal system." Id. ¶¶ 16-17. Instead, IPC "often offered entry level employees[] a few 'overtime hours' to clean the pit/trench." Id. ¶ 17.

On June 9, 2019, the day of Plaintiff's injury, Plaintiff was cleaning the pit/trench of the trench conveyor trim removal system. Id. ¶ 21. At the direction of his supervisor, Plaintiff did so "while the machine was still in operation and the conveyor belt was in motion." Id. ¶ 22. Although IPC had "shut down" the facility on at least one prior occasion to clear the pit area, id. ¶ 13, "employees were directed to clean [the] pit/trench while the trench conveyor trim removal system was still in operation." Id. ¶ 18. The removal system's moving parts were "unguarded" by design, and there were "no safety guards in place" at the time of Plaintiff's accident. Id. ¶¶ 13, 38. Thus, while Plaintiff was "cleaning the debris, the roller on the conveyor belt caught Plaintiff's gloves

and rolled his left hand into the machine," ultimately crushing Plaintiff's left arm. Id. ¶ 22. Because the employees who cleaned the pit area did not have access to and "were not trained in lock out tag out (LOTO)" procedures, other employees on the floor were unable to stop the machine without the assistance of a manager. Id. ¶¶ 19-22.

Plaintiff filed suit on or about June 8, 2021, in the Superior Court of New Jersey, Camden County, alleging that IPC had "committed an intentional tort by inducing its employee, Plaintiff, who was not trained or qualified to enter the scrap trench conveyor area, with overtime pay to perform the dangerous task of cleaning the pit while the machine and plant was in full operation." ECF No. 1-1 ¶ 20. Plaintiff also asserted claims of negligent hiring/retention and a respondeat superior theory of negligence based on the unidentified supervisor's directives. Id. ¶¶ 31-36. IPC subsequently removed the action to federal court on November 5, 2021, on the basis of diversity jurisdiction. ECF No. 1. Plaintiff filed his first amended complaint on March 27, 2022, which joined defendant Air Conveying Corporation ("ACC") to the action and alleged products liability and negligent supervision claims against it. ECF No. 15 ¶¶ 31-35. After ACC filed a motion to dismiss the first amended complaint for, among other things, failure to state a claim and insufficient pleading [ECF No. 23], Plaintiff sought leave to amend his complaint to address the deficiencies identified by ACC and further clarify his claims. ECF No. 28. Plaintiff ultimately filed his second amended complaint on September 12, 2023.[3] ECF No. 46. The Court held a conference

---

[3] This Court initially denied Plaintiff's motion without prejudice due to the motion's noncompliance with the pertinent local rules, failure to explain why amendment was proper under Federal Rule of Civil Procedure 15(a)(2), and insufficient pleading regarding the applicable statutes of limitations and Plaintiff's claims against ACC. ECF No. 37. Plaintiff renewed his motion as directed by the Court on February 13, 2023, after correcting these deficiencies. ECF No. 38. In an opinion and order dated September 5, 2023, this Court granted the renewed motion as it pertained to the products liability claims against ACC, but denied the motion insofar as Plaintiff sought to add claims against Weyerhaeuser Company regarding its alleged design of the machine's electrical system. ECF No. 43.

with counsel for all parties on October 20, 2023, at which the parties raised the issue of a potential third amended complaint. ECF No. 54. Following this conference, the Court directed Plaintiff's counsel to confer with counsel for defendants "so that th[e] complaint is filed on consent and consistent with the Court's earlier order." Id.

Plaintiff filed the TAC on October 27, 2023.[4] ECF No. 55. The TAC states five counts: (1) intentional tort/intentional wrong by IPC; (2) products liability against ACC based on allegedly defective manufacturing and design, as well as ACC's failure to warn and strict liability; (3) negligence claims against IPC based on the conduct of IPC employees pled as fictitious defendants, under a theory of respondeat superior; (4) negligent hiring/retention/supervision against fictitious defendants; and (5) products liability claims against fictitious defendants. Id. IPC filed a letter objection to the TAC on November 20, 2023, in which it asserted that the TAC improperly included IPC in Plaintiff's demands for relief under the second through fifth counts by demanding joint and several liability between all defendants. ECF No. 61. In the same letter, IPC noted that it did "not concede that th[e first count] is properly pled." Id.

On December 8, 2023, IPC filed this motion to dismiss in lieu of an answer, arguing that Plaintiff's claim under count one is barred by the New Jersey Workers' Compensation Act ("WCA"), N.J.S.A. § 34:15-8, and reiterating its arguments regarding the remaining counts. ECF No. 64. Plaintiff's opposition to the motion was received on January 2, 2024. ECF No. 68.

## II. **Legal Standard**

---

[4] The TAC differs from the second amended complaint in that it removes references to Weyerhaeuser Company that were mistakenly included in the final filing, rephrases the title of the second count, and removes IPC and ACC as named defendants with respect to the fourth count. Compare ECF No. 46 with ECF No. 55. The Court and all parties have treated the TAC as the operative complaint in this matter.

4

"To withstand a motion to dismiss for failure to state a claim, a 'complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" Tobin v. Samsung Elecs. Am., Inc., Civ. No. 18-12473, 2019 WL 1399557, at *2 (D.N.J. Mar. 27, 2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The Court must "accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff." City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp., 908 F.3d 872, 878 (3d Cir. 2018). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Marmone v. Gerdau, No. 3:20-cv-02903, 2021 WL 791848, at *2 (D.N.J. Feb. 26, 2021) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Instead, the Court will "disregard legal conclusions and 'recitals of the elements of a cause of action, supported by mere conclusory statements.'" Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Zuber v. Boscov's, 871 F.3d 255, 258 (3d Cir. 2017) (quoting Iqbal, 556 U.S. at 678).

Courts in the Third Circuit apply a three-step analysis in reviewing the sufficiency of a complaint under Rule 12(b)(6). Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016). First, the Court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." Id. (alterations in original) (quoting Iqbal, 556 U.S. at 675). Second, the Court must identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. (quoting Iqbal, 556 U.S. at 679). Third, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. (alterations in original) (quoting Iqbal, 556 U.S. at 679).

## III. Discussion[5]

Enacted in 1911, the WCA represents a "historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment." Van Dunk v. Reckson Assocs. Realty Corp., 45 A.3d 965, 970 (N.J. 2012) (quoting Millison v. E.I. du Pont de Nemours & Co., 501 A.2d 505, 512 (N.J. 1985)). Under the WCA, employers must "provide swift and certain payment, without regard to fault, to employees for workplace injuries" in an amount determined by a statutory schedule. Id. at 971; N.J.S.A. § 34:15-7. This remedy is exclusive and will bar a suit for common law tort damages unless the employee's injury was caused by the employer's "intentional wrong." N.J.S.A. § 34:15-8; Van Dunk, 45 A.3d at 971 ("When, by either express or implied agreement, the parties have accepted the provisions of the [WCA], the agreement operates as an employee's surrender of other forms of remedies."). Both IPC and Plaintiff acknowledge this statutory scheme, and it appears undisputed that Plaintiff's claims cannot proceed against IPC unless Plaintiff has pled sufficient facts to plausibly demonstrate that the intentional wrong exception applies to this case.

While the WCA itself does not define the term "intentional wrong," the New Jersey Supreme Court has developed a two-part test to determine whether an employer is shielded from liability under N.J.S.A. § 34:15-8:

> First, a court considers the "conduct prong," examining the employer's conduct in the setting of the particular case. Second, a court analyzes the "context prong," considering whether "the resulting injury or disease, and the circumstances in which it is inflicted on the worker, [may] fairly be viewed as a fact of life of

---

[5] Because Plaintiff acknowledges in his brief that "only the First Count is directed towards IPC alleging an 'Intentional Tort,'" it appears undisputed that the second through fifth counts of the TAC should be dismissed as to IPC. Therefore, the Court's discussion focuses on whether Plaintiff has pled sufficient facts in the first count of the TAC to state a claim for relief against IPC.

6

> industrial employment," or whether it is "plainly beyond anything the legislature could have contemplated as entitling the employee to recover <u>only</u> under the Compensation Act."

Van Dunk, 45 A.3d at 972 (alteration in original) (citations omitted) (quoting Millison, 501 A.2d at 514).

The conduct prong requires the Court to consider whether Plaintiff has pled sufficient facts to plausibly demonstrate that IPC acted with the knowledge that its conduct carried a "substantial certainty" of injury or death. Laidlow v. Hariton Mach. Co., 790 A.2d 884, 894 (N.J. 2002). Under the conduct prong, "[a]n intentional wrong must amount to a virtual certainty that bodily injury or death will result." Van Dunk, 45 A.3d at 978. Thus, "[m]ere knowledge by an employer that a workplace is dangerous does not equate to an intentional wrong," nor does conduct that merely "could" result in injury or death. Id. In determining whether an employer committed an intentional wrong, relevant factors can include the employer's response to an accident, citations by OSHA either before or after the accident, prior employee complaints or injuries, or the presence of other explicit warnings that the employer's practices created a risk of injury. Hocutt v. Minda Supply Co., 235 A.3d 1047, 1057-58 (N.J. App. Div. 2020). The New Jersey Supreme Court has also found an employer's affirmative ongoing efforts to deceive regulatory inspectors relevant, particularly where the employer "deliberately and systematically deceives OSHA" over an extended period of time prior to the accident. Laidlow, 790 A.2d at 896-98 (finding conduct prong satisfied in part because for thirteen years, employer left machine unguarded at all times except when OSHA inspectors visited the facility); Crippen v. Cent. Jersey Concrete Pipe Co., 823 A.2d 789, 792-93, 797 (N.J. 2003) (finding conduct prong satisfied for summary judgment purposes where employer intentionally deceived OSHA into believing violations were cured for eighteen months prior to accident). The removal of a safety guard may also meet the intentional wrong

7

standard. Laidlow, 790 A.2d at 895. However, no single course of conduct or set of facts is dispositive; rather, courts must consider the totality of the circumstances surrounding the injury and the employer's role in causing it. Van Dunk, 45 A.3d at 978.

As for the context prong, the Court considers whether "as a matter of law an employee's injury and the circumstances in which the injury is inflicted are 'plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act.'" Id. at 980 (quoting Millison, 501 A.2d at 514). "The conduct and context analyses are related and . . . overlap to a great degree." Id. at 979. To that end, "the same facts and circumstances generally will be relevant to both prongs." Crippen, 823 A.2d at 796. However, the context prong "acts as an additional check against overcoming the statutory bar to a common-law tort action" and exists to "reinforce the strong legislative preference for the workers' compensation remedy." Van Dunk, 45 A.3d at 979-80. To that end, while the conduct prong is a fact-intensive question that may be determined by the appropriate fact-finder, the context prong presents an issue of law that is solely for the court to answer. Crippen, 823 A.2d at 796. Both the conduct and context prongs must be proven for the plaintiff's claims to proceed; accordingly, courts need not proceed to the context prong if the plaintiff fails to satisfy the conduct prong. See Van Dunk, 45 A.3d at 979.

IPC argues that even taken as true, the facts in the TAC "amount to no more than potential negligence, but not an intentional wrong." ECF No. 64-1 at 6.[6] Specifically, IPC contends that "[a]ny alleged deficiencies in training, safety and lock-out-tag-out . . . procedures or failing to shut down the plant during cleaning are all aspects of a potential negligence claim," but do not establish

---

[6] The Court adopts the page numbers assigned by IPC, as opposed to those automatically assigned by the electronic filing system.

that IPC knew that its practices were virtually certain to result in injury. Id. at 7. IPC points out that according to the TAC, IPC directed employees to conduct weekly cleanings according to the same procedures for several months prior to the accident, all without incident. Id. at 6. To the extent that IPC made misrepresentations to OSHA, such misrepresentations are irrelevant because they occurred after the accident and had no causal relationship to Plaintiff's injuries. Id. at 7-8. Moreover, IPC's practice of offering overtime pay to employees for clearing the pit/trench area cannot be considered an "intentional wrong" because "offering overtime to employees who perform additional work is also a common workplace practice." Id. at 7. In any event, IPC argues, the TAC cannot satisfy the context prong because "[w]orking with and cleaning machinery and equipment are a normal part of 'everyday industrial life,'" and are therefore squarely within the category of conduct that the WCA was intended to immunize. Id. at 6.

In response, Plaintiff argues that the TAC alleges "sufficient facts and circumstances to demonstrate that IPC acted 'knowing with substantial certainty' that injury would result from its actions, thereby satisfying the conduct prong. ECF No. 68 at 6. For support, Plaintiff emphasizes the allegations that: (1) a representative from IPC's Human Resources department directed IPC to shut down the facility prior to clearing the area several months prior to Plaintiff's accident, and therefore IPC was aware of the risks associated with clearing the area while the machine was in operation; (2) IPC nevertheless directed employees to clear the area while the machine was in operation; (3) the employees clearing the area were not trained in lock-out-tag-out procedures; (4) Plaintiff's injury occurred when he was in fact clearing out the area while the machine was in operation; and (5) IPC's intentional misrepresentations to OSHA that employees were trained on lock-out procedures and that Plaintiff failed to implement those procedures before entering the pit/trench area. ECF No. 68 at 6-7; ECF No. 55 ¶¶ 12, 18, 23-27. As for the context prong, Plaintiff

9

argues that the circumstances of Plaintiff's injury are "unequivocally outside the norms of 'industrial life' and beyond the legislative intent of the Act" because IPC directed him to clear the area "without the proper training and without shutting the [s]ystem down pursuant to its own protocol." ECF No. 68 at 7.

Taking all of the allegations in the TAC as true and giving Plaintiff the benefit of all reasonable inferences, the Court finds that the facts as alleged in the TAC do not plausibly demonstrate that IPC's alleged practices rise to the level of intentional wrong. According to the TAC, IPC's alleged "intentional wrong" lies in its decision to direct Plaintiff, an individual who was "not trained or qualified to enter the scrap trench conveyor area," to clear the trench area "in proximity to hazardous moving parts" while the machine was in "full operation" without providing access to the machine's LOTO procedures. ECF No. 55 ¶¶ 24-25. The TAC alleges that the hazard stemmed from the "unguarded" pulleys which created a "nip hazard" with each other. Id. ¶ 40. Accordingly, for the purposes of this motion, the Court accepts that clearing the pit area carried a great risk of injury. Laidlow, 790 A.2d at 896 (noting that machines that require an employee to manually feed material into a nip point pose a great risk of injury). However, the TAC fails to explain how IPC's decisions to forego additional training and to continue production while employees cleared the trench area elevated the risk of injury to a virtual certainty. See Hocutt, 235 A.3d at 1058-59. Even if, as the TAC alleges, IPC was "aware of the risk and danger of cleaning the pit/trench area while the trench conveyor trim removal system was in operation," ECF No. 55 ¶ 23, mere awareness of a risk does not equate to a virtual certainty of injury. Van Dunk, 45 A.3d at 978; Millison, 501 A.2d at 514-15 ("[W]e have observed heretofore the mere knowledge and appreciation of a risk—even the strong probability of a risk—will come up short of the 'substantial

certainty' needed to find an intentional wrong resulting in avoidance of the exclusive-remedy bar of the compensation statute.").

Furthermore, the TAC does not contain any facts that would shed light on what, if any, knowledge IPC had concerning the risk of injury associated with its decisions. "[T]he escalation to intentional wrong generally occurs when the repeated conduct is committed in disregard of prior OSHA citations or other warnings." Hocutt, 235 A.3d at 1059. Here, the TAC does not allege the existence of any safety standard or protocol, internal or external, that would have put IPC on notice that clearing the trench area without stopping operations carried a substantial certainty of injury.[7] See Van Dunk, 45 A.3d at 978 (noting that conduct prong typically satisfied where evidence demonstrates employer's "longer-term decision to forego required safety devices or practices"). Moreover, the TAC does not allege that there were any prior incidents or injuries, employee complaints, or OSHA citations arising out of IPC's decision. Hocutt, 235 A.3d at 1059 (finding conduct prong not satisfied where record contained no evidence of prior accidents, OSHA violations, failure to abate violations, or employee complaints relating to the employer's longstanding unsafe practice); Laidlow, 790 A.2d at 897 (finding prior close calls, employee complaints, and deception of OSHA inspectors "persuasive evidence" that employer knew that injury was substantially certain to occur). To be sure, IPC's alleged misrepresentations regarding the circumstances of Plaintiff's accident to OSHA inspectors is some evidence that IPC's practice did not comply with workplace safety regulations. ECF No. 55 ¶¶ 26-27; Laidlow, 790 A.2d at

---

[7] Nor does Plaintiff's bare allegation, raised for the first time in his opposition brief, that IPC violated its own "protocols," a term defined nowhere in the TAC, carry any weight in this analysis. That purported violation is not pled in the TAC, and "[i]t is axiomatic that [a] complaint may not be amended by the briefs in opposition to a motion to dismiss." Paracha v. Darling Ingredients Inc., Civ. No. 20-4902, 2021 WL 1051728, at *4 (D.N.J. Mar. 19, 2021) (alterations in original) (quoting Frederico v. Home Depot, 507 F.3d 188, 202 (3d Cir. 2007)).

897. However, this after-the-fact misrepresentation, without more, does not sufficiently demonstrate IPC's appreciation of the risk prior to the accident, which is the focus of the intentional wrong inquiry. Fermaintt ex rel. Est. of Lawlor v. McWane, Inc., 694 F. Supp. 2d 339, 348-49 (D.N.J. 2010). Moreover, even if IPC did know its practice violated safety regulations, an employer's knowing violation of OSHA regulations, standing alone, does not elevate the employer's conduct to an intentional wrong. Van Dunk, 45 A.3d at 977.

As for the context prong, the TAC is deficient because it contains no facts which would suggest that Plaintiff's injury and the circumstances surrounding it were "more than a fact of life of industrial employment." Hocutt, 235 A.3d at 1059 (quoting Laidlow, 790 A.2d at 894). According to the TAC, the allegedly hazardous moving parts were unguarded by design, and the trim removal system was "unchanged and was in the same condition at the time of the injuries alleged" as it was at the time of sale. ECF No. 55 ¶¶ 37, 40. Therefore, this is not a case where the employer deliberately removed a safety device from a machine or otherwise altered it to increase productivity at the expense of worker safety. See Mull v. Zeta Consumer Prods., 823 A.2d at 782, 786 (N.J. 2003) (finding context prong satisfied where employer removed safety device from machine, altered it to start up without warning, and employer knew of prior accidents, employees' concerns, and OSHA citations which "underscored the machine's hazardous condition"). Moreover, the TAC, as drafted, does not allege that IPC was uniquely situated to appreciate the dangers posed by the trim removal system, or that it withheld knowledge from its employees regarding those risks. See Millison, 501 A.2d at 516 (finding context prong satisfied where physicians provided by employer misled employees about their development of asbestos-related illnesses after working conditions exposed employees to asbestos); Blackshear v. Syngenta Crop Prot., Inc., Civ. No. 10-3585, 2011 WL 5238801, at *4-5 (D.N.J. Oct. 31, 2011) (finding context

prong satisfied where complaint alleged employer knew the hazardous nature of the chemicals and hid it from employee on the grounds that while employee's exposure was expected, the concealment of risk was not). The TAC alleges, essentially, that Plaintiff was injured as a result of IPC's deliberate decision to incur some risk to employees for the purpose of maximizing the facility's productivity. The Court does not mean to condone such practices, but recognizes that "such decisions are a type of mistaken judgment that is a fact of life in industrial workplaces," and therefore, as pled, IPC's alleged conduct is not "plainly beyond anything the Legislature intended the WCA to immunize." Hocutt, 235 A.3d at 1060. The TAC's failure to plead facts sufficient to satisfy the context prong is an independently sufficient reason to grant IPC's motion to dismiss. Therefore,

**IT IS** on this **28th** day of **June 2024**,

**ORDERED** that the motion to dismiss all counts of the TAC against defendant IPC is **GRANTED**. Because it is not clear that any attempt to amend the complaint against IPC would be futile, Plaintiff should have one last opportunity to state a sufficient factual basis for the "conduct" and "context" elements of IPC's alleged "intentional wrong," if counsel can do so within the constraints of Fed. R. Civ. P. 11(b).[8] Therefore, Count One is dismissed without prejudice. Plaintiff may file, within fourteen (14) days, an amended complaint reasserting his intentional tort claim to the extent he can in good faith cure the deficiencies identified herein. As it appears undisputed that the second through fifth counts of the TAC should be dismissed against IPC, any amended pleading should be revised to remove references to IPC as to those counts.

---

[8] The Court notes that it previously allowed Plaintiff leave to amend his complaint, but that this was in relation to pleading deficiencies identified in the Court's September 12, 2023 Order, which did not concern IPC. Accordingly, the Court will grant Plaintiff one final opportunity to correct his pleading.

s/ Matthew J. Skahill
MATTHEW J. SKAHILL
United States Magistrate Judge